Ralph WALLEM, Appellant–Plaintiff,

v.

CLS INDUSTRIES, INC., Carolyn Short, Myron Short, Indianapolis Airport Authority and Indianapolis International Airport, Appellees–Defendants.

No. 88A04–9904–CV–157.

Court of Appeals of Indiana.

March 9, 2000.

Michael F. Harper, Franklin, Indiana, Attorney for Appellant.

Peter G. Tamulonis, Eric D. Johnson, Kightlinger & Gray, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Plaintiff–Appellant Ralph Wallem (Wallem) appeals the trial court's grant of summary judgment in favor of Defendants–Appellees CLS Industries, Inc. (CLS), Carolyn Short (Carolyn), Myron Short (Myron), Indianapolis Airport Authority, and Indianapolis International Airport, (hereinafter collectively referred to as "Defendants"), on Wallem's four count complaint against Defendants.

We affirm in part and remand with instructions.[1]

### ISSUES

Wallem presents several issues for our review which we consolidate and restate as follows:

1. Whether the trial court erred in granting summary judgment in favor of

---

1. Defendants' request for oral argument is denied.

Defendants on Wallem's breach of compensation contract claim.

2. Whether the trial court erred in granting summary judgment in favor of Defendants on Wallem's claim for a purported resignation bonus.

3. Whether the trial court erred in granting summary judgment in favor of Defendants on Wallem's statutory claim under Ind.Code § 36–1–12–1 *et seq.*, for his alleged unpaid portion of a compensation package.

4. Whether the trial court erred in granting summary judgment in favor of Defendants on Wallem's fraud claim.

## FACTS AND PROCEDURAL HISTORY

CLS is a certified Disadvantaged Business Enterprise (DBE) construction contractor. It may also be characterized as a Women–Owned Business Enterprise (WBE), owned and operated by a female, Carolyn Short. Carolyn's husband, Myron, is an employee of CLS. Generally, CLS performs construction work as a subcontractor of a prime contractor. Under 49 CFR 23 *et seq.*, firms owned, operated, and controlled by minorities and women (minority business enterprises (MBE)), are given the fullest possible participation opportunity to participate in Department of Transportation programs, including airport and highway development.

Sometime in 1991, Wallem wished to perform engineering work for a DBE because he perceived a legitimate business opportunity. On October 2, 1991, Wallem met with Carolyn and Myron to discuss financial terms under which he wished to work for CLS. Wallem made a proposal whereby he would work with CLS, submitting bids on behalf of CLS for construction engineering work, and perform the work. Wallem proposed a compensation package plan whereby he would receive a percentage of the gross construction engineering income. After this meeting Carolyn and Myron stressed their concern that they did not believe that Wallem's plan would work because Wallem could not legally be a subcontractor of CLS, which is a subcontractor in and of itself.

However, Wallem became an employee of CLS, salaried at approximately $700.00 per week. Wallem worked for CLS in its construction engineering division from October of 1991 until October of 1994. During Wallem's employment, there was a significant amount of discussion regarding Wallem's compensation. In April, 1994, Wallem made his first demand for payment of his purported bonus he argued that he was due as a result of his bonus proposal discussed at the first meeting on October 2, 1991. However, CLS disagreed with the amount Wallem was due.

As a result, on March 25, 1996, Wallem filed a four count complaint against Defendants, stemming from an alleged breach of this purported bonus agreement with CLS. In Count I, Wallem contended that Carolyn and Myron committed fraud by failing to pay him his purported bonus. Count II presented a claim against CLS for breach of an oral employment contract for Defendants' refusal to pay pursuant to the alleged agreed upon bonus formula. Count III asserted a statutory claim under Ind. Code § 36–1–12–1 *et seq.* to recover the unpaid portion of Wallem's compensation package attributable to the Indianapolis Airport project. Count IV asserted a breach of a September 1, 1994 Settlement Agreement. Additional facts will be supplied where necessary.

Wallem filed his amended complaint on April 15, 1996. On May 8, 1996, Defendants filed their answer and affirmative defenses. On August 7, 1998, Defendants filed their motion for summary judgment and brief in support of summary judgment. On November 9, 1998, Wallem filed his brief in opposition to Defendants' motion for summary judgment, together with Wallem's affidavit and other evidentiary materials in support of his motion. On February 8, 1999, a hearing was held of Defendants' motion for summary judgment. On March 10, 1999, the trial court

granted Defendants' motion for summary judgment. On May 10, 1999, the trial court entered its subsequent order granting Defendants' motion for summary judgment on Counts I through IV of Wallem's amended complaint and Defendants' answer and affirmative defenses thereto. Wallem now appeals.

## DISCUSSION AND DECISION

### Standard of Review

■■■ This case was resolved below by summary judgment. Our standard of review is well-established. Summary judgment is appropriate only if the pleadings and evidence sanctioned show "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Ind.Trial Rule 56(C). When reviewing a summary judgment ruling, we stand in the shoes of the trial court. *Becker v. Four Points Inv. Corp.*, 708 N.E.2d 29, 30 (Ind.Ct.App. 1999). We do not weigh the evidence, but construe the pleadings and designated materials in a light most favorable to the nonmovant. *Id.* The party appealing from the grant of summary judgment has the burden of persuading the court that the grant of summary judgment was erroneous. *Greathouse v. Armstrong*, 616 N.E.2d 364, 366 (Ind.1993). The trial court's determination is carefully scrutinized to assure that the party against whom summary judgment was entered is not improperly prevented from having its day in court. *Id.*

### I. Breach of Employment Contract—Count II[2]

Wallem contends that summary judgment was improper because genuine issues of material fact exist regarding whether CLS breached the oral, at will employment contract entered into with Wallem by failing and refusing to pay Wallem the bonus

earned by him under the oral, at will employment agreement. CLS responds that no breach occurred because Wallem's deposition testimony as well as statements Wallem made in a letter, establish that CLS did not agree to the terms of the purported bonus agreements, and therefore, no meeting of the minds occurred in order to establish a contract. Thus, CLS argues that the purported bonus agreements are unenforceable.

■■■ It is fundamental that a contract is formed by the exchange of an offer and acceptance between contracting parties. *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 435 (Ind.1993). For a completed oral contract to exist, the parties must agree to all terms of the contract. *Keating v. Burton*, 617 N.E.2d 588, 592 (Ind.Ct.App.1993). The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract. *Olsson v. Moore*, 590 N.E.2d 160, 162 (Ind.Ct.App. 1992). A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind.Ct.App.1994). The question of whether a certain or undisputed set of facts establishes a contract is one of law for the trial court. *Indianapolis v. Twin Lakes Enterprises*, 568 N.E.2d 1073, 1079 (Ind.Ct.App.1991).

■■■ In this case, the designated evidence indicates that CLS did not accept Wallem's proposed bonus arrangement. CLS never represented to Wallem, either orally or in writing, that CLS agreed to Wallem's proposed bonus arrangement, and would be responsible for paying him pursuant to that proposal. Rather, the evidence indicates nothing more than that Wallem assumed CLS agreed to the pro-

---

**2.** In their briefs, both parties raise three other subissues with respect to the breach of employment contract issue. However, because we find that no meeting of the minds exists, and hence no contract exists, we need not address these other subissues because they are without merit if no contract exists.

posal and would pay him pursuant to this bonus arrangement.

We are unwilling to hold that a mere proposal regarding a bonus arrangement, without any evidence of acceptance, creates a binding contract which obligates the proposing party to be paid pursuant to the proposal. The designated evidence does not establish that Wallem reached an agreement with CLS on all terms of the contract as Wallem alleges, and the trial court properly granted summary judgment on this claim.

The undisputed facts reveal that on October 2, 1991, Wallem met with Myron and Carolyn in Evansville to discuss the financial terms under which Wallem wished to work as an at will employee of CLS. At that meeting, Wallem proposed that as an at will employee of CLS, he would perform the engineering work for projects on which CLS bid, and in turn, CLS would pay him a bonus, representing the profit balance remaining after CLS received an up front percentage of the gross construction engineering income, and paid all job salaries, expenses and costs. However, Myron explained to Wallem that he did not believe that CLS, as a DBE, could employ Wallem as a subcontractor of a subcontractor. In his deposition, Wallem concedes to the fact that at this point in time, he "thought the deal was dead." (R. 248, Wallem Deposition). Shortly thereafter, Myron telephoned Wallem and suggested that Wallem become an employee of CLS, stating to Wallem that he thought he had figured out a way to employ Wallem. However, Myron also stated to Wallem that Wallem would work as an employee of CLS, and that "then we would figure out a way to dispense the profits." (R. 234, Wallem Deposition). Wallem stated in his deposition that sometime in March, 1992, he became an employee of CLS, receiving a salary of approximately $700 per week. In his deposition, Wallem was questioned regarding whether at the time he went on CLS's payroll, or at any time before he became an employee, there were any dis-cussions about any other payments he was to receive other than the $700 per week salary. The only discussion Wallem referenced was the in person meeting that occurred in Evansville:

Q. At the time you went on the payroll, or at least up to that point, were there any discussions about any other payments that were going to be made to you?

A. Well, prior to before we had ever started doing it, we had—we had talked about how much I wanted to do the deal.

Q. When did you talk about how you wanted to do a deal?

* * * * *

A. Let's drop back to the face-to-face meeting in front of the building in Evansville.

Q. Okay.

A. This was when I laid out what I wanted to do, that they would get a percentage off the top, and then we would take out all our expenses—salary, truck, whatever else there was in the line of doing the work, supplies—and what was left would come to me then. So that was—that was the way that was [sic] done at the meeting.

Q. But you didn't identify a percentage off the top; is that correct?

A. I think I might've mentioned 10 percent, but I don't recall exactly.

Q. So you don't recall whether you mentioned a specific percentage?

A. No.

* * * * *

Q. So that at the very least, certainly as of that date [of the face-to-face meeting], there wasn't an indication that that kind of an approach was acceptable; is that correct?

A. Well, that wasn't the reason it was not acceptable.

Q. What was the reason that it wasn't acceptable?

A. The reason it was not acceptable was the reason of not being a sub of a sub. That was the way I had wanted to do it.

(R. 245–247, Wallem Deposition).

As discussed above, Myron explained to Wallem at the Evansville meeting that Wallem's compensation proposal was not permissible because a DBE cannot subcontract work. However, in his deposition, Wallem explains that he assumed that he was being hired in furtherance of his proposal when he talked to Myron on the telephone:

Q. Didn't Greg Head tell you before you even contacted CLS that you couldn't be a sub of a sub?

A. Well, he said there's gotta be a way to do it, but he didn't know what it was. Then I didn't understand what was—at the time much about the program.

Q. All right.

A. So ... And then, I felt like—like I said, I thought the deal was dead till [sic] I got a call from Myron and said [sic] he thought he might've figured a way to do it.

Q. And then in the course of that telephone conversation, Myron did not explain to you the way he had figured it out—

A. Well, the way, it was to become an employee of CLS.

Q. Was there any more discussion than that?

A. Well, I—I considered it to go without saying that the other conditions of the deal were the same.

Q. Oh, okay, I think we've got it now and that's how it fits into this framework. You assumed that there were going to be these—

A. I was not told anything to the contrary.

(R. 248–249, Wallem Deposition).

On February 5, 1993, Wallem met with Myron and Carolyn to discuss his bonus. Carolyn represented to Wallem that her calculation resulted in a bonus of $39,116, but Wallem disagreed with Carolyn's calculation, arguing that the correct bonus should have been $72,537. Consequently, Wallem was not paid any bonus for 1992.

In April, 1994, Wallem made his first request via fax, for his bonus to be paid, outlining his purported bonus numbers. During May, 1994, Wallem contacted Carolyn and asked her if she had "anything set up on the bonus yet", to which Carolyn replied "[w]ell, you know, I still haven't had time to look at my numbers." (R. 312). During the following months, Wallem sent Carolyn numerous letters and faxes asking for his bonus. In Wallem's letter in June, 1994, he admits that at least up to that date, there was no agreement regarding a bonus program or method of calculation:

I have been giving more thought to the bonus situation and believe that what is needed is for *CLS to come up with a mathematical formula* for determining the amount of bonus due me at any point in time.

Following is an *example of the bonus calculation*: ...

*If we had a formula* like this, the bonus amount could be figured every month. . . .

(R. 599) (emphasis added).

After reviewing the pleadings and designated materials in the light most favorable to Wallem as the non-movant, it is our finding that the trial court properly granted summary judgment in favor of the Defendants on Wallem's breach of contract claim. Wallem's own statements during his deposition reveal that he merely made a bonus proposal to CLS at the Evansville meeting which was not accepted. Further, Wallem concedes that he thought the deal was dead at that point. Wallem also stated in his deposition that following the subsequent telephone conversation with Myron, he assumed that Myron's employment offer included Wallem's previous bonus proposal. Finally, the letter Wallem sent

to Carolyn reveals that no bonus agreement existed following the Evansville meeting or the subsequent telephone conversation, because Wallem was still submitting proposed methods for calculating his bonus. Wallem's own testimony and statements reveal that CLS never agreed to Wallem's bonus proposal, and Wallem's breach of contract claim is based on nothing more than his assumption that CLS had agreed to his bonus proposal.

## II. *Breach of Settlement Agreement— Count IV*

■ Next, Wallem contends that summary judgment was improper because genuine issues of material fact exist regarding whether CLS breached the oral settlement agreement entered into with Wallem by failing and refusing to pay Wallem the weekly payments. CLS responds that no breach occurred because the purported resignation bonus agreement was not in writing and could not have been performed within one year, and therefore, the agreement is barred by the Statute of Frauds.[3]

The Statute of Frauds provides:

No action shall be brought in any of the following cases: ...

Fifth: Upon any agreement that is not to be performed within one (1) year from the making thereof ...

Unless the promise, contract or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized ...

Ind.Code § 32–2–1–1. Defendants argue that the Statute of Frauds is applicable to

this agreement due to the fact that it will not be performed within one year. Both parties agree that they reached an oral agreement regarding the purported resignation bonus on September 1, 1994. The bonus was for a total of $39,116.00, and was to be paid in weekly installments of $784.00 beginning on October 21, 1994, when Wallem terminated his employment with CLS. Thus, although the purported resignation bonus agreement was made on September 1, 1994, the terms of the agreement were that the entire payment would not be fully performed until approximately October 7, 1995,[4] more than one year after the agreement was made. Defendants argue that because the agreement was not to be performed within one year from the date it was made, the purported resignation bonus agreement is unenforceable.

However, Wallem argues that the agreement is not governed by the Statute of Frauds because Defendants could have paid the bonus in full within one year. Wallem relies on *Silkey v. Investors Diversified Services,* for his argument that oral settlement agreements with payment provisions that extend beyond the one year limitation period are not barred by the Statute of Frauds if the payor can make the full payments within one year. 690 N.E.2d 329 (Ind.Ct.App.1997). In that case, we noted the fact that settlement agreements that *may not* be performed within one year is insufficient alone to make the agreement subject to the requirements of the Statute of Frauds:

It must affirmatively appear by the terms of the contract, that its stipulations are not to be performed within a year after it is made, in order to bring it within the provisions of the statute of

---

3. In their brief in support of their motion for summary judgment, Defendants also raise the issue that the purported resignation bonus agreement is an attempt by Wallem to illegally split profits with a DBE, and therefore, the agreement is unenforceable. Because we find that the settlement agreement is barred by the Statute of Frauds, and summary judgment may be affirmed on either of Defendants' theories with respect to Count IV, we refrain

from addressing the illegality issue and affirm the trial court's summary judgment decision on Defendants' Statute of Frauds issue alone.

4. This date is arrived at by multiplying $784.00 by 50 weeks, equaling $39,200.00. Fifty weeks from October 21, 1994 would be approximately October 7, 1995.

frauds. (sic) The Statute of Frauds has always been held to apply only to contracts which, *by the express stipulations of the parties*, were not to be performed within a year, and not to those which *might or might not*, upon a contingency, be performed within a year. The one year clause of the Statute of Frauds has no application to contracts which are *capable* of being performed within one year of the making thereof.

*Silkey*, 690 N.E.2d at 334, ( quoting *Wior v. Anchor Industries, Inc.*, 641 N.E.2d 1275, 1278 (Ind.Ct.App.1994)), *rev'd on other grounds*, 669 N.E.2d 172 (Ind.1996), *reh'g denied* (emphasis added) (internal citations omitted); *Kiyose v. Trustees of Indiana Univ.*, 166 Ind.App. 34, 333 N.E.2d 886 (1975).

In *Silkey*, the agreement required payment of a certain sum *on or before* a certain date. *Silkey*, 690 N.E.2d at 334. We held that the agreement was not governed by the Statute of Frauds because it was not definite on its face that the agreement could not be performed within one year, and because the agreement allowed payment of the sum to be made *before* the one year time limitation period. *Id.* Thus, because we found that it was possible that the agreement could be fully performed within one year of its making, and because there was no express stipulation between the parties that the agreement would not be performed within one year, the agreement fell outside the Statute of Frauds. *Id.*

However, in our case, the terms of the settlement agreement were definite that the contract would not be fully performed within one year. According to the agreement made on September 1, 1994, if the Defendants began paying Wallem $784.00 on October 21, 1994, until the entire $39,116.00 was paid in full, the agreement would not have been fully performed within one year of the date the agreement was made; September 1, 1995. Thus, unlike *Silkey*, the parties in our case expressly stipulated to the payment arrangement,

which was not capable of being fully performed within one year. Therefore, because the purported oral bonus resignation agreement could not be fully performed within one year, the agreement is governed by the Statute of Frauds, and is unenforceable. The trial court properly granted summary judgment in favor of the Defendants on Wallem's claim of breach of the Settlement Agreement.

III.  *Ind.Code § 36-1-12-1 et seq.—Count III*

Next, Wallem contends that he is entitled to payment of $44,850.00 pursuant to Ind.Code § 36-1-12-1 *et seq.* (Public Works Projects Act) for labor he performed as an employee of CLS on a public works project at the Indianapolis International Airport.

Ind.Code § 36-1-12-1 *et seq.* is a statutory scheme which provides for the payment of contractors, laborers, material suppliers, and those who perform services for public work projects. *See Indiana Carpenters Pen. Fund v. Seaboard*, 601 N.E.2d 352, 357 (Ind.Ct.App.1992). The scheme fulfills the purpose of securing payment for subcontractors, laborers, materialmen and service providers in relation to or in connection with the public works construction project. *Id.* This relief is mandated by statute because mechanic's liens are not available to a claimant who works on public works projects. *Id.* These statutes do not have as their purpose the narrowing of a claimant's rights; rather they expand the rights of claimants who would be left without the ability to recovery for the materials, labors, or services if general contractors and public entities were unable to make payment. *Id.* Generally, the public works board is required to withhold sufficient monies from the contractor to pay subcontractors, laborers, material suppliers, and those performing services. *Id.*

In our case, the designated evidence reveals that in his deposition, Wallem made several admissions that removes

Wallem's claim from the gambit of the Public Works Projects Act. First, Wallem admitted that there was no specific agreement for CLS to pay him a bonus relating to the Airport project:

Q. I take it, then, from what you're testifying to there was no agreement that you would be paid a bonus relating to the Airport project?

A. I—I said that I was settling for $39,116.00, and I said you can have all the profits off the Airport. Yeah, that's what I said.

Q. Right. So, at this point there wasn't an agreement to pay a bonus relating to the Airport project?

A. Well, you can, I guess, maybe look at it as the $39,000 is what we agreed for everything involved.

(R. 318–319, Wallem deposition). Second, Wallem admitted that the bonus agreement that he alleged he was entitled to was based upon the profitability of CLS's engineering department as a whole, and not based upon the profitability of any given job:

Q. You testified that for 1992, you expected to get a bonus based on a particular calculation method. And my question to you is, with respect to applying that calculation method whether you got or were entitled to a bonus for 1992 did not depend on the amount of work that you personally performed or even the profitability of any given job but the so-called profitability of the engineering division as a whole?

A. In '92?

Q. Right.

A. Yeah, I'd say that's right.

(R. 319–320, Wallem deposition). Third, in arriving at the figure of $44,850.00, Wallem guessed at the numbers used to support the sum purportedly owed to him:

Q. And is that the same formula that you thought you were using as of February 5th of '93?

A. I think so. I don't know for sure. This is—I did this claim form when I was sitting in his office. And I had no calculator; I didn't have anything other than a pen. And I didn't—You know, I'm guessing at the numbers there.

Q. You were guessing at the numbers when you were filling out the form?

A. Yes. Well, I didn't fill the form out. I filled out a piece of paper, or I, you know, was talking to him.

(R. 329, Wallem deposition). Finally, Wallem testified in his deposition that the amount he claimed was due to him ($44,-850.00), was not based on the profitability of the engineering department as a whole, but was instead based on the purported profitability of the Airport project. However, Wallem also stated that the amount had nothing to do with any particular hours that he had worked on the Airport project:

Q. And that number relates to what you perceived to be at that point in time what the profitability of that particular job should have been concerning—

A. That number represents what I thought was due me.

Q. And the basis for the calculation is what you perceived to be the profitability on that job?

A. I guess you could say that.

Q. It didn't relate to the particular hours that you worked or didn't work on that job?

A. No.

(R. 330–331, Wallem deposition).

It is clear that the evidence reveals that Wallem admitted that no specific agreement existed with respect to a bonus for the Airport project, the bonus agreement that Wallem claimed he was entitled to was based upon the profitability of CLS's engineering department as a whole, and not based upon the profitability of any given job. However, Wallem testified in his deposition that the purported bonus sum that he claimed he was due was based on the profitability of the Airport project, but the amount was not connected with

any particular hours that he had worked on the Airport project. Therefore, because we find that Wallem's claim is not connected with the services he provided for the Airport project, Wallem's claim under the Public Works Projects Act is not sustainable, and hence Wallem is owed no money pursuant to this claim. The trial court properly granted summary judgment in favor of Defendants for Wallem's claim under the Public Works Projects Act.

### IV. *Fraud—Count I*

Finally, Wallem argues that Defendants committed fraud in connection with Wallem's purported bonus arrangement. Specifically, Wallem claims that he was fraudulently led on for years by Defendants, and that Defendants made false statements of existing facts that Wallem relied on, inducing him to continue his employment at a modest wage without a bonus. Defendants argue that Wallem's claim for fraud is based on promises of future conduct, representations upon which Wallem could not have relied, and speculation.

▬ In order to recover on a theory of fraud a plaintiff must demonstrate: 1) a material representation of a past or existing fact which, 2) was false, 3) was made with knowledge or reckless ignorance of its falsity, 4) was made with the intent to deceive, 5) was rightfully relied upon by the complaining party, and 6) proximately caused injury to the complaining party. *Sample v. Kinser Ins. Agency, Inc.,* 700 N.E.2d 802, 805 (Ind.Ct.App.1998). Actual fraud may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not executed. *Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool,* 678 N.E.2d 832, 837 (Ind.Ct.App. 1997).

▬ In the case at hand, the Record reveals that in his amended complaint Wallem raised ten instances of fraud: 1) that Carolyn and Myron fraudulently represented that they had been reviewing their records and had been discussing how to implement the agreement concerning Wallem's bonus; 2) that when he presented his figures regarding the bonus he felt entitled to for 1992, Carolyn and Myron fraudulently represented that he was entitled to a lower number; 3) that in 1993, Carolyn and Myron fraudulently represented that they understood Wallem's objections to their proposed bonus calculation, and that they would consider his objections, without ever having an intention to pay his bonus; 4) that Myron fraudulently represented that Wallem had Myron's "word as a man that you will get your money." (R. 45); 5) that in February, 1994, Myron fraudulently represented that Wallem's bonus for 1993 was $1,531.00; 6) that Carolyn and Myron fraudulently misrepresented the amount of expenses associated with their alleged bonus calculation for 1993; 7) that Wallem was induced to bid on a project at the Indianapolis airport by Defendants' alleged misrepresentation that Carolyn and Myron were in the process of resolving the dispute regarding Wallem's purported bonus arrangement; 8) that Carolyn fraudulently misrepresented that she had not had time to review Wallem's bonus calculation numbers; 9) that Carolyn subsequently reviewed Wallem's proposed bonus calculation, and that his numbers were incorrect; and 10) that Carolyn fraudulently represented that Wallem would be paid what he was owed and that she was looking to see how she could pay him.

After reviewing Wallem's fraud claim contained within his amended complaint, as well as the Defendants' designated evidence, we find that none of Wallem's fraud claims fit into the factors Wallem must meet in order to recover under a theory of fraud. Wallem's several claims of fraud contained within Count I. of his amended complaint will not support a claim of fraud because they are nothing more than statements or representations made by Defendants regarding future intentions, Wallem failed to show that he relied upon the

alleged misrepresentations in any way, or Wallem's allegations of fraud were mere speculation as to what he believed Defendants were doing in order to pay him the bonus. Therefore, we find that the trial court properly granted summary judgment in favor of the Defendants on Wallem's fraud claim.

## CONCLUSION

Based on the foregoing, we hold the trial court properly granted summary judgment in favor of Defendants on Wallem's four count amended complaint.

■ However, because there is evidence in the Record that Wallem did in fact perform services for Defendants without payment, we remand this case to the trial court for a hearing in order to determine Wallem's just compensation under the theory of quantum meruit. We further note that unjust enrichment and quantum meruit are merely legal fictions invented by the common law courts in order to permit recovery where in fact there is no true contract, but where, to avoid unjust enrichment, the courts permit recovery of the value of the services rendered just as if there had been a true contract. *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind.1991), *reh'g. denied, cert. denied.*

Affirmed in part and remanded with instructions.

ROBB, J., concurs.

FRIEDLANDER, J., concurs in part and dissents in part with opinion.

FRIEDLANDER, Judge, concurring in part and dissenting in part

I fully concur with the majority's resolution of all of the issues presented by the parties. I respectfully dissent, however, from the majority's determination in the concluding paragraph of the opinion that Wallem is entitled to damages under the equitable theory of quantum meruit. I discern no basis upon which to invoke our equitable powers.

I recognize that courts have full discretion to fashion equitable remedies that are complete and fair to all parties involved. *See Shell Oil Co. v. Meyer*, 684 N.E.2d 504 (Ind.Ct.App.1997), *aff'd in this respect, rev'd on other grounds*, 705 N.E.2d 962 (Ind.1998). However, the jurisdiction of a court is limited by the pleadings before that court invoking that jurisdiction. *New Life Comm. Church of God v. Adomatis*, 672 N.E.2d 433 (Ind.Ct.App.1996). "The powers of a court of equity are limited to the cause of action and issues made by the pleadings.... Under a general prayer for relief, an equity court may not grant relief inconsistent with the pleadings and trial theory and repugnant to the specific prayer for relief." *Id.* at 438 (quoting *Kemp v. Woods*, 363 Mo. 427, 434, 251 S.W.2d 684, 688 (1952)).

In the instant case, after examining the pleadings, I cannot perceive upon what basis this case sounds in equity. The complaint seeks: (Count I) punitive damages from CLS based upon an allegation of willful breach of the oral contract, (Count II) money damages from CLS based upon the allegation of simple breach of the oral contract (*i.e.*, refusal to pay the bonus), (Count III) money damages from the Airport based upon an allegation that the Airport was informed of services provided by the plaintiff that it thereafter declined to pay plaintiff for those services, and (Count IV) money damages from CLS based upon an allegation that CLS wrongfully repudiated the oral contract with the plaintiff by refusing to pay the bonus. In my view, none of these counts assert claims sounding in equity.

In addition to the fact that Wallem did not request quantum meruit damages in the complaint, I note that Wallem did not address such damages in the proceedings before the trial court. Moreover, after reviewing the record, I am forced to conclude that the trial court did not consider quantum meruit damages. It is also sig-

nificant to me that neither party mentioned, much less briefed, the issue on appeal. Accordingly, I believe there is no basis for the majority's exercise of the equitable powers of this court. I would not remand for a hearing on possible quantum meruit damages, but instead would affirm the trial court in all respects.