Larrianté SUMBRY, Appellant–Plaintiff,

v.

John PERA and Anna Anton, Appellee–Defendants.

No. 46A03–0303–CV–101.

Court of Appeals of Indiana.

Sept. 10, 2003.

Larrianté Sumbry, Michigan City, IN, Appellant Pro Se.

## OPINION

MAY, Judge.

Larrianté Sumbry, acting *pro se,* appeals the trial court's dismissal without prejudice of his complaint against John Pera and Anna Anton.[1] He raises three issues:

1. Whether the trial court abused its discretion in dismissing his complaint;

---

1. No appellee's brief was filed.

2. Whether the trial court abused its discretion in declining to appoint counsel; and

3. Whether the trial court abused its discretion in redesignating his civil action.

We affirm.[2]

## FACTS AND PROCEDURAL HISTORY

On December 18, 2002, Sumbry filed a complaint against Pera and Anton in the LaPorte Superior Court. On that same day an Order was entered allowing Sumbry to proceed as an indigent upon payment of a partial filing fee of $6.00. On December 27, 2002, the trial court assessed the $6.00 filing fee. On February 11, 2003, the trial court entered the following order: "Plaintiff having failed to comply with I.C. 33–19–3–2.5 as Ordered December 18, 2002, the Court now Orders the above cause of action dismissed without prejudice."[3]

## DISCUSSION AND DECISION

1. *Dismissal of Complaint*

■ Sumbry's entire argument on this issue is:

Trial court abused it's [sic] discretion for charging appellant six (6) dollars for filing fees when he is indigent and only received five (5) dollars during the time he pursued this action which shows that the court violated the statutory requirements set forth in I.C. 33–19–3–2.5 which lead [sic] to his cause of action being dismissed due to the fraud committed by the court trying to deceive appellant in paying a fee that is not authorized by law. See *Caminetti v. U.S.*, [242 U.S. 470,] 37 S.Ct. 192, 194 [61 L.Ed. 442] (1917), *Wallem v. CLS Industries, Inc.*, 725 N.E.2d 880 ( [Ind.Ct. App.] 2000).

(Br. of Appellant at 3–4.)[4]

The dismissal of Sumbry's action was not error. Ind.Code § 33–19–3–2.5 provides in pertinent part:

(b) When an offender commences an action or a proceeding without paying fees or other court costs under section 2 of this chapter, the offender shall obtain from the appropriate official of the correctional facility or facilities at which the offender is or was confined, a certified copy of the prisoner's trust fund account statement for the six (6) months immediately preceding submission of the complaint or petition. The offender shall file the trust fund account statement in addition to the statement required under section 2 of this chapter.[5]

2. Sumbry filed a number of motions during the pendency of this appeal, including a "Motion to Compel Trial Court to Furnish Appellant with a Filed–Stamped [sic] Copy of his Notice of Appeal," a Verified Petition to File Belated Appeal, and a Request for Transfer to the Supreme Court. In his notice of appeal, he also requested oral argument and a pre-appeal conference. We deny his request for oral argument and pre-appeal conference, deny his "Motion to Compel Trial Court to Furnish Appellant with a Filed–Stamped [sic] copy of his Notice of Appeal," and find moot his Verified Petition to File Belated Appeal. We are not in a position to rule on his Request for Transfer to the Supreme Court; he

may file that following the disposition of this appeal.

3. The Order was not attached to nor contained in Sumbry's Brief or Appendix. Nor are the pages of the Appendix numbered as required by Ind. Appellate Rule 51(C).

4. Neither decision supports Sumbry's claim. *Caminetti* involved violations of the white slave trade act. *Wallem* involved an employee's claim against his employer for breach of contract, breach of settlement agreement, and fraud.

5. Ind.Code § 33–19–3–2 provides:

(c) The offender shall pay a partial filing fee that is twenty percent (20%) of the greater of:

(1) The average monthly deposits to the offender's account; or

(2) the average monthly balance in the offender's account:

for the six (6) months immediately preceding the filing of the complaint or petition. However, the fee may not exceed the full statutory fee for the commencement of actions or proceedings.

(d) If the offender claims exceptional circumstances that render the offender unable to pay the partial filing fee required by this section, in addition to the statement required by section 2 of this chapter and the statement of account required by subsection (b), the offender shall submit an affidavit of special circumstances setting forth the reasons and circumstances that justify relief from the partial filing fee requirement.

(e) If the court approves the application to waive all fees, the court shall give written notice to the offender that all fees and costs relating to the filing and service will be waived. If the court denies the application to waive all fees, the court shall give written notice to the offender that the offender's case will be dismissed if the partial filing fee is not

paid within forty-five (45) days after the date of the order, or within an additional period that the court may, upon request, allow. Process concerning the offender's case may not be served until the fee is paid.

(Footnote supplied.)

Sumbry's "Civil Plenary Action" filed on December 18, 2002, does not contain a statement pursuant to Ind.Code § 33–19–3–2 as to his indigency, nor does the record reflect he attached a certified copy of his trust fund account statement as required by Ind.Code § 33–19–3–2.5. Sumbry did not contest the trial court's assessment of a $6.00 filing fee. In fact, for the 55 days from the Order assessing the $6.00 filing fee until the dismissal without prejudice, Sumbry did nothing. Sumbry's failure to comply with these statutes resulted in the dismissal without prejudice of his action, and the dismissal was not an abuse of discretion.[6] The dismissal of Sumbry's action was without prejudice; presumably, he may therefore file the proper documents pursuant to Ind.Code §§ 33–19–3–2 and 33–19–3–2.5 along with his complaint.

2. *Appointment of Counsel*

██ Sumbry argues the trial court abused its discretion when it declined to

---

A person entitled to bring a civil action or to petition for the appointment of a guardian under IC 29–3–5 may do so without paying the required fees or other court costs upon filing in court, under oath and in writing, a statement:

(1) declaring that the person is unable to make the payments or to give security for them because of the person's indigency;

(2) declaring that the person believes that the person is entitled to the redress sought in the action; and

(3) setting forth briefly the nature of the action.

**6.** Sumbry did not provide us with a copy of the trial court's Order Granting Leave to Pro-

ceed as an Indigent Upon Payment of Partial Filing Fee, so we are unable to review Sumbry's assertion that the trial court did not properly notify him that his case would be dismissed within 45 days should the filing fee not be paid. Sumbry, as the Appellant, has the duty to provide us with all relevant documents on appeal. *See Burns v. State*, 255 Ind. 1, 6, 260 N.E.2d 559, 562 (1970) ("It is the duty of the party bringing an appeal to include in the record so much of the proceedings below as is necessary for adjudication of the issues raised on appeal. The appellant having failed to do so in this case, he has waived the issues raised[.]")

appoint counsel. Sumbry requested the appointment of counsel and the trial court did not rule on his motion. However, as Sumbry did not pay the filing fee and his case was dismissed without prejudice before any action was taken by the trial court, this issue is moot. Should Sumbry properly comply with the above-referenced statutes, the trial court will then be obliged to consider whether his case warrants the appointment of counsel pursuant to *Sholes v. Sholes,* 760 N.E.2d 156 (Ind. 2001).

### 3. *Redesignation of Civil Action*

 Sumbry contends the trial court changed his Civil Plenary Action to a "Miscellaneous Cause of Action," stripping him "of his substantive due process rights to proceed with his case in the manner of his choice and caused harm to his first and fourteenth amendment rights to equal access to the civil justice system." (Br. of Appellant at 5.)

Administrative Rule 8 provides for the numbering of cases filed in our courts. There are separate designations for Civil Tort, Civil Plenary, and Miscellaneous actions. Miscellaneous cases are "[c]ivil cases other than those specifically identified—*i.e.* change of name, appointment of appraisers, marriage waivers, etc." *Id.* Sumbry's action "is a civil action for legal malpractice, obstruction of justice, judicial misconduct, negligence, denial of equal protection clause of the Fourteenth Amendment." (App. of Appellant.)

Sumbry offers no argument in support of his bald assertion that the redesignation of his action was error. We are therefore unable to address this allegation of error.

---

7. Sumbry directs us to no authority for his assertion. Neither case cited by Sumbry in his brief, *Partlow v. Superintendent, Miami Correctional Facility,* 756 N.E.2d 978 (Ind.Ct. App.2001), dealing with a trial court's im-

App. R. 46(A)(8)(a). Furthermore, we are aware of no authorities that indicate cases on a civil plenary docket are treated differently from those on a miscellaneous docket.[7] We therefore decline to find the placement of Sumbry's case on a miscellaneous docket rather than a civil plenary docket to be error.

Affirmed.

DARDEN, J., and BARNES, J., concur.

**Joseph HENDERSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 49A05–0301–CR–37.**

Court of Appeals of Indiana.

Sept. 11, 2003.

Rehearing Denied Oct. 22, 2003.

proper labeling of a habeas corpus action as a post-conviction relief action, or *Crafton v. Gibson,* 752 N.E.2d 78 (Ind.Ct.App.2001), dealing with grandparent visitation, has any apparent relevance to this allegation of error.

Janice L. Stevens, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Joseph Henderson appeals from his convictions for two counts of murder and two counts of robbery. He presents two issues for our review: whether the trial court erred in instructing the jury on self-defense, and whether the trial court erred in denying Henderson's request to instruct the jury on theft.

We affirm.

During the evening of October 14, 1998, Henderson and Mario,[1] who was Henderson's marijuana supplier, went to the home of Jermaine Miller, to whom Henderson had agreed to sell $2,400 worth of marijuana. Waiting at Miller's home were Miller's girlfriend and three other male individuals, William Clark, Ricky Harris, and Darrell Odom. Henderson informed them that he did not have the marijuana with him and that he wanted to make sure that Miller had the money. They all counted the $2,400 and Henderson asked if he could take it and go get the marijuana. Miller, Harris, and Odom refused so Henderson agreed to bring it by later that evening. Henderson later called and said that he had to throw the marijuana out because he had been pulled over by the police.

The following day Henderson went to dinner with his mother. On the way home, he saw Brett Dorsey, Andrea Itce, and Ashley Curtis at the home of Ashley's ex-boyfriend. Henderson's mother dropped him off there. Henderson approached Dorsey and, while whispering in

---

1. In the testimony "Mario" is referred to only by the single name.

his ear, asked him if he wanted to make $500. Henderson told Dorsey that he needed a driver.

The four got into Dorsey's car and stopped by Henderson's mother's home, where Henderson had been staying for a couple of weeks. Henderson went inside and put on a hooded sweatshirt. They then went to Dorsey's house where they watched TV. While there, Henderson took out the handgun which he was carrying and cleaned it.[2] To clean it, he put on rubber gloves and wiped down the gun, the clip, and the bullets with a paper towel.

Henderson received a page and called the designated number. Henderson told Dorsey that he had spoken to the people he needed to meet and asked Dorsey to drive him to a local Shell gas station. After arriving at the Shell station, Henderson approached Miller and Odom, who was driving the other car, and told them that they needed to get rid of the other passenger in the car because he wanted to deal on a one-to-one basis. Henderson and Dorsey then returned to Dorsey's apartment while Odom and Miller took the other passenger home. Miller and Odom then paged Henderson and Henderson and Dorsey left to meet them at a McClure gas station.

At the gas station, Henderson spoke with Miller and Odom and then they left to go to a different location. Miller and Odom followed Dorsey's car to the back of an industrial complex that Henderson had discussed earlier with Dorsey, Andrea, and Ashley. Both Dorsey and Odom backed their cars up to a building. Henderson exited Dorsey's vehicle and walked around to the passenger side of Odom's car. Miller got out and Henderson climbed into the backseat. Miller then got back into the car and Henderson asked to see the money

so that he could count it. Miller refused to let him count it; rather, he counted it himself. Henderson then exited the vehicle and returned to Dorsey's car. He reached into the backseat and retrieved a black bag which belonged to Dorsey. He removed the handgun from his waistband and placed it into the bag and returned to Odom's car. Once Henderson was in the backseat, Dorsey saw Odom turn toward Henderson and make some movements. Henderson then pulled out the handgun and shot Odom in the head. Henderson then shot Miller twice in the head. As he exited the car, Henderson took approximately $600 which he stated was lying on the ground outside of the car. Henderson jumped into Dorsey's car and they left the scene. They first returned to Dorsey's apartment and then took Andrea and Ashley over to Mario's home where Dorsey purchased marijuana for the group to smoke.

Henderson was subsequently charged with six counts, two counts of murder for the killing of Miller and Odom, two counts of felony murder for causing the deaths of Miller and Odom while committing robbery, and two counts for the robbery of Miller and Odom. At his first trial, the jury returned a guilty verdict to the charge of murder of Miller but could not reach a verdict on the other charges and the trial court declared a mistrial on the remaining charges. He received a sentence of 65 years for his conviction, with five years suspended. Henderson sought an appeal of his conviction to our Supreme Court, which had jurisdiction of his appeal at that time. However, he then requested a stay of his appeal pending resolution of the remaining charges against him. The appeal was dismissed without prejudice, and Henderson was granted leave to appeal the original murder conviction along with

---

**2.** The evidence established that the handgun belonged to Henderson's uncle.

any subsequent convictions in one consolidated appeal.

At the second trial, Henderson was charged with the remaining five counts and was found guilty of each one by the jury. The guilty verdicts for the felony murder of Odom and Miller were then dismissed by the trial court for reasons of double jeopardy. The trial court then sentenced Henderson to sixty years incarceration for the murder of Odom to be served concurrent to the sixty-year executed sentence for the murder of Miller. Henderson was also ordered to serve concurrent twenty-year sentences for the two robbery convictions. The sentences for the robbery convictions were ordered to be served consecutive to the sentences for both murders.

Henderson then sought to appeal his convictions from the second trial as well as his conviction from the first trial. The jurisdiction of our Supreme Court, as found in the Indiana Constitution, Article 7, Section 4, was changed by the voters in the general election on November 7, 2000. Consequently, this court was vested with jurisdiction over Henderson's second appeal and would have had jurisdiction over Henderson's first appeal had it been filed after January 1, 2001. Therefore, by order of our Supreme Court, this court was to assume jurisdiction of all matters relating to Henderson's appeal.

 Henderson first challenges the propriety of the self-defense instruction given to the jury by the trial court. The manner of instructing a jury is left to the sound discretion of the trial court. *Lewis v. State*, 759 N.E.2d 1077, 1080 (Ind.Ct. App.2001), *trans. denied.* The trial court's ruling will not be reversed unless the in-

structional error is such that the charge to the jury misstates the law or otherwise misleads the jury. *Id.* Jury instructions must be considered as a whole and in reference to each other; even an erroneous instruction will not be error if the instructions taken as a whole do not misstate the law or otherwise mislead the jury. *Id.* at 1080–81. Moreover, in determining whether a defendant suffered a due process violation based upon an incorrect jury instruction, we consider other relevant information given to the jury, including closing argument. *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind.2002), *reh'g denied; Isom v. State*, 651 N.E.2d 1151, 1153 (Ind. 1995).[3] In reviewing a trial court's decision to give or refuse tendered instructions, we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions which are given. *Smith v. State*, 777 N.E.2d 32, 34 (Ind.Ct.App.2002), *trans. denied.*

In instructing the jury on self-defense at the first trial, the following instruction was used:

"The defense of self-defense is defined by law as follows:

A. A person is justified in using reasonable force against another person to protect himself or a third person from what he reasonably believes to be the imminent use of unlawful force. However, a person is justified in using deadly force only if he reasonably believes that force is necessary to prevent serious bodily injury to himself or a third person or the commission of a forcible felony. No person in this state shall be placed in

---

3. Although argument of counsel is neither evidence nor conclusive as to the applicable law, the holding of our Supreme Court allows such argument to be considered as giving dimension and context to the case as submitted to the jury.

legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary.

A person is not justified in using force if:

1. He is committing, or is escaping after the commission of, a crime;

2. He provokes unlawful action by another person with intent to cause bodily injury to the other person; ...

The State has the burden of disproving this defense beyond a reasonable doubt." Appendix at 196.

Henderson had tendered an instruction similar to that given by the trial court. The difference in the two instructions is that the one which Henderson tendered to the trial court contained only the first full paragraph of the above instruction and did not contain any reference to the restrictions on the use of force if someone is or was involved in the commission of a crime or has provoked the other party's actions.

 Henderson now asserts that the instruction as given was erroneous and that if his tendered instruction was not given, the jury should have been instructed that the criminal activity which would preclude the use of self-defense must have produced the confrontation where the force was employed.[4] The State asserts that Henderson cannot complain about the instruction because his tendered instruction did not include any information in regard to what he now alleges is erroneous. However, Henderson need not have tendered an instruction in order to have preserved his claim of instructional error. In *Scisney v. State*, 701 N.E.2d 847, 849 (Ind. 1998), our Supreme Court determined that an alternative instruction is not necessarily required to preserve a claim of error when

an objection is made which clearly identifies both the claimed objectionable matter and the grounds for the objection. In this case, Henderson objected to the trial court's instruction, gave the grounds upon which the objection was based, and cited to *Harvey v. State*, 652 N.E.2d 876 (Ind.Ct. App.1995), to support his contention. Henderson's objection was sufficient to preserve the error for appeal.

In *Harvey*, this court determined that the statute providing for the defense of self-defense precludes its use where it is sought by one who was actively engaged in the perpetration of a crime and that the criminal activity produced the confrontation wherein the force was employed. *Id.* at 877. In *Harvey*, the defendant, who did not have a license to carry a handgun, had shot and killed another individual. The trial court instructed the jury as follows, "A person who is not in his home or fixed place of business and is carrying a handgun without a license cannot by law claim the protection of the law of self defense." *Id.* at 876. In ruling upon Henderson's objection, the trial court concluded that *Harvey* was not controlling because in *Harvey* the court held that defendant was entitled to a self defense instruction because the crime in which he was engaged was a passive possession and there was no nexus between that offense and the shooting of the murder victim. Unlike *Harvey*, the drug dealing activity in which Henderson was involved was the cause for the individuals being armed which resulted in the shooting.

Since the time of *Harvey*, and after Henderson's first trial, our Supreme Court has had the opportunity to address when and how a jury must be instructed on self-defense. In *Mayes v. State*, 744 N.E.2d