Ben OLSSON, Lee Ferree and Debra Ferree, Appellants–Defendants,

v.

Forrest MOORE and Nancy Moore, Appellees–Plaintiffs.

No. 53A01–9108–CV–238.

Court of Appeals of Indiana, First District.

April 15, 1992.

Frank E. Spencer, Indianapolis, for appellants-defendants.

Thomas Bunger, Bunger, Robertson, Kelley & Steger, Bloomington, for appellees-plaintiffs.

BAKER, Judge.

Defendant-appellants Ben Olsson, Lee Ferree, and Debra Ferree (collectively, Olsson) appeal an adverse judgment rendered in favor of plaintiff-appellees Forrest and Nancy Moore. The issue we must decide is whether the trial court correctly determined that Olsson must bear the burden of fire damage to home renovations performed by the Moores.

## FACTS

In late 1988 Forrest and Nancy Moore responded to a newspaper advertisement placed by Ben Olsson concerning a house and lot for sale in Monroe County. At that time, evidently, the home was unsuitable for winter habitation. The Moores indicated their willingness to buy the property, and wished to begin renovations on the home immediately because the closing on the sale of their then current home was imminent. Olsson agreed, and by mid-December of 1988, after placing the utility services in their name, the Moores had repaired and repainted the kitchen floor, had renovated two bedrooms, the living room, the dining room, and had re-roofed the house. During this time the parties were negotiating the purchase price of the home. The Moores wanted to buy more than just the one acre of land offered in the advertisement, so that too was under discussion. Olsson declined the down payment the Moores offered as unnecessary.

Whether a contract was formed between the two parties is an issue in dispute. Certainly there was no written contract. Forrest Moore testified that he thought the deal was the home and 40 acres for $70,000. Nancy Moore testified that the price changed so much she could not keep track of it. Olsson had a survey drawn up for a sale of about five acres, but testified that at the time of the fire there was no definite agreement about acreage or price.

On December 16, 1988, the day after the Moores closed on the sale of their then current home, the Olsson home they were renovating burned to the ground. Excepting only some materials left a short distance from the house, it was a total loss. Olsson was insured, however, and collected $40,000 from his insurance company. The insurance adjuster testified that no part of that payment was for the improvements or materials the Moores had provided.

A good deal of testimony was presented about comments made to the Moores after the fire. Several witnesses testified to the effect that Olsson was concerned about the loss the Moores suffered and promised to make things right, whether by reducing the price of the property should the Moores wish to buy it, or by simply reimbursing the Moores for the materials and labor they expended. Eventually the Moores tendered a bill for $5,000 to Olsson for material and labor, but Olsson refused to pay.

The Moores brought suit against Olsson. They sought "a judgment against the Defendants in an amount adequate to compensate them for the materials supplied, work performed, expenses incurred, lost profits, and all other damages deemed proper under the premises." *Record* at 4. The trial court issued a general judgment in which it awarded the Moores $2,730 for labor, $2,013.64 for materials, and $55.27 for utility bills the Moores had paid, for a total award of $4,798.91. Olsson appeals.

## DISCUSSION AND DECISION

When reviewing a general judgment, we do not reweigh evidence or reas-

sess the credibility of witnesses. Instead, we consider only the evidence favorable to the judgment together with all reasonable inferences derivable therefrom. *Union Fed. Sav. Bank v. INB Banking Co. Southwest* (1991), Ind.App., 582 N.E.2d 426, 428 (citation omitted). We must affirm the trial court's judgment if it can be sustained on any legal theory supported by the evidence, and we presume the judgment is based on findings supported by the evidence. *Id.*

In this instance, the trial court specified only that the Moores were to receive some $4,800 for the labor and materials they supplied; it offered no specific legal theory for its judgment. It is our task, then, to examine the record to determine whether a legal theory supports the trial court's general judgment. Because this dispute arose in the context of the sale of real property, our inquiry begins by determining whether the Moores and Olsson entered an agreement for the transfer of Olsson's home and land to the Moores.

### Did a Contract for the Sale of the Home and Land Exist?

 The evidence confirms the conclusion that no contract for the sale of the home and land existed. Unquestionably there was no written contract.[1] It is clear to us no oral contract existed, as well. All of the three principal parties (the two Moores and Olsson) testified regarding their understanding of the negotiations for the purchase of the house and land, and each version contrasted starkly from the others. Forrest Moore believed he was purchasing the home and 40 acres for $70,-000. Ben Olsson was more interested in selling the home and only five acres of land, and testified that the purchase price and acreage was unsettled. Nancy Moore testified the price changed so often she could not keep track of it. These minds did not "meet" as required by standard contract law. If the parties' expressions fail to show agreement on essential terms of the purported agreement, there is no mutu-

al assent and hence no contract. *Goethals v. De Vos* (1977), 174 Ind.App. 143, 366 N.E.2d 673, 674. The situation at the time of the fire was more akin to "an agreement to agree."

Additionally, we note well that neither party has sought to transfer the property through the remedy of specific performance. The Moores' complaint sought only to recover the value of the improvements they had made to the property, and that is all they seek now. The evidence amply supports the conclusion that no contract existed for the sale of the property. Given that no contract existed, the issue becomes who must bear the cost of the Moores' destroyed improvements.

### Did the Moores' Improvements Confer a Benefit Upon Olsson?

The Moores argue their work conferred a benefit upon Olsson to the extent the value of Olsson's property increased. Olsson responds by claiming he received no benefit from the Moores' improvements, as they were destroyed by fire and never intended for his use in the first place. He argues he never offered to pay the Moores for their work and that the Moores never expected any payment from Olsson.

We disagree with Olsson's contention that he received no benefit from the Moores' renovations. Assuming for the sake of argument that both parties intended the Moores' work to be for the Moores' benefit, the fact remains that Olsson was the legal and equitable owner at all times, including the day of the fire. Olsson does not dispute the fact that the Moores' work increased the value of the home. Because the home was still Olsson's, the conclusion that Olsson benefitted from the Moores' improvements is inescapable. The value of his house increased. And because the Moores and Olsson had not entered a contract for the sale of the property, it cannot be said equitable ownership had passed from Olsson to the Moores. *Ridenour v. France* (1983), Ind.App., 442 N.E.2d 716, 717 (upon consummation of real estate con-

---

1. Because we have determined no contract for the transfer of the real property existed, no

issues arise concerning Indiana's statute of frauds, IND.CODE 32–2–1–1 *et seq.*

tract, purchasers become equitable owners and, absent contrary agreement, must assume risk of loss). The record supports the conclusion that Olsson benefitted from the Moores' endeavors.

### Did Olsson Consent to the Benefit He Received?

 Having determined Olsson benefitted from the Moores' work, we must determine whether Olsson consented to the work being performed, for a party who receives a benefit he has not expressly or impliedly agreed to is under no obligation to pay for that benefit. *Dyer Construction Co., Inc. v. Ellas Construction Co., Inc.* (1972), 153 Ind.App. 304, 287 N.E.2d 262. Principles of equity, however, prohibit the unjust enrichment of a party who accepts the unrequested benefits another provides despite having the opportunity to decline those benefits. *Id.* Our review of the record convinces us Olsson did, in fact, sanction the work the Moores performed. During Olsson's cross-examination, the following exchange occurred:

Q: What about the house, did you give [the Moores] permission to do anything to the house?

A: Yes I told them they could go ahead and start painting *and doing whatever they needed,* including the repairs to the kitchen floor. *At no time was ever putting a new roof discussed,* I would not have let that happen.

Q: Well how did you find out about the roofing?

A: I just went down there one day and my roof was off of the house.

Q: When was that?

A: I remember that to be on December 15th, the day before the fire.

Q: That's the first time you knew anything about the roof?

A: Yes. I'd never, I just never heard, *it was never discussed,* or had heard, of all things the house needed, it didn't need a roof.

*Record* at 115–16 (emphasis added). This testimony establishes that 1) Olsson told the Moores they could do "whatever they needed," and 2) Olsson failed to communicate to the Moores they were not to touch the roof. Thus, as far as the Moores knew, they could do whatever they felt was necessary to make the house more habitable, including roof repair. Because the evidence in the record establishes the Moores undertook considerable effort and expense in repairing the roof and also establishes their ignorance of the impending inferno, the evidence supports the conclusion the Moores reasonably believed the roof needed repair, and therefore, that Olsson consented to the roof repair, as well as to the other work the Moores performed.

### Conclusion

Because we have determined there was no contract to enforce or to shift the risk of loss, the property remained exclusively Olsson's. Since the Moores' work increased the value of the property, Olsson benefitted from the Moores' work. Because evidence adduced from the record supports the legal theory that Olsson consented to the Moores increasing the value of his property, Olsson must bear the cost of the benefits he ratified. The trial court correctly awarded the Moores the cost of their labor and expenses in bestowing the benefits; therefore, the judgment of the trial court is affirmed.

RATLIFF, C.J., and GARRARD, J., concur.