**John FIEDERLEIN, M.D.,**
**Appellant–Plaintiff,**

v.

**Alex BOUTSELIS, M.D. and Steve**
**Jones, M.D., Appellees–**
**Defendants.**

No. 79A04–1010–PL–632.

Court of Appeals of Indiana.

Aug. 25, 2011.

Anne L. Cowgur, Casey J. Eckert, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

James R. Fisher, Debra H. Miller, Miller & Fisher, LLC, Indianapolis, IN, Attorneys for Appellees.

## OPINION

KIRSCH, Judge.

John Fiederlein, M.D. ("Fiederlein") filed a complaint against Alex Boutselis, M.D. ("Boutselis") and Steve Jones, M.D. ("Jones") (collectively "the Defendants") alleging breach of contract, promissory estoppel, unjust enrichment, conversion, criminal conversion, interference with employment relationship, and fraud. The dispute arises in regard to an offer for Fiederlein to become a member in the medical practice where the parties were employed and which was owned by Unity Healthcare, L.L.C. ("Unity"). Boutselis and Jones filed a counterclaim, requesting a refund of money they claimed was an advance paid in anticipation of Fiederlein's membership, which was never consummated. Fiederlein appeals the trial court's order, raising the following consolidated issues:

I. Whether the trial court erred when it granted summary judgment in favor of the Defendants on Fiederlein's claims of breach of contract, promissory estoppel, unjust enrichment, interference with employment relationship, and fraud; and

II. Whether the trial court erred in denying Fiederlein's motion for summary judgment as to the Defendants' counterclaim.

The Defendants cross-appeal, raising the following, restated issue:

III. Whether the trial court erred when it failed to enter summary judgment against Fiederlein on all of his claims, including his unjust enrichment claim as it pertains to the capital account refunds.

We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY[1]

This case arises from a dispute between Fiederlein and the Defendants. All of the parties were radiologists working together at Unity. The Defendants were already members of Unity when Fiederlein started working there in 2002. All three doctors worked in the InnerVision division of Unity, an outpatient imaging center. Compensation was paid to each doctor by Unity according to Unity's compensation structure, which under Unity's Third Amended Operating Agreement ("the Operating Agreement"), effective October 2003, was based on the membership class of each doctor. At the time the Operating Agree-

---

1. Oral argument was heard on this case on July 19, 2011 in Indianapolis. We commend counsel on the quality of their written and oral advocacy.

ment went into effect, both Boutselis and Jones were Class C members of Unity, while Fiederlein was a Class F member. Under the Operating Agreement, Unity was contractually bound to grant a Class C membership promotion to any member that the Defendants recommended. The Defendants also had another business called Integra Imaging Partners, L.L.C. ("Integra"), which was the professional division of their business. The Defendants were the sole partners in Integra until January 1, 2003.

In late 2002, a proposal was drafted by the Defendants ("the proposal") and presented to Fiederlein and another doctor, Tim Lach ("Lach"), in December 2002. The proposal contained terms under which Fiederlein and Lach would become partners in Integra. The terms related to Integra were agreed upon by Fiederlein, and he became a partner in Integra on January 1, 2003. The proposal also contained provisions whereby both Fiederlein and Lach could acquire voting rights and share in the profits of InnerVision. *Appellant's App.* at 63. However, the proposal did not mention anything regarding making Fiederlein a Class C member in Unity as such a member classification did not exist until the Operating Agreement took effect in October 2003. The proposal was drafted with the presumption that there would be four people involved in the agreement—Boutselis, Jones, Fiederlein, and Lach. Although Fiederlein agreed with the terms contained in the proposal, Lach did not, and he eventually left InnerVision and Integra. He is not a party to this action.

The proposal also included requirements for Fiederlein to attain a promotion at InnerVision and begin to share in the profits. *Id.* These included drafting and executing internal agreements relating to InnerVision, signing for an equal share of InnerVision's line of credit, signing Inner-

Vision's lease, and establishing preferential death, disability, and retirement benefit agreements for the Defendants as founding members of InnerVision. *Id.* None of these documents was ever executed.

The Operating Agreement became effective in October 2003. The classification of Class C member was created, and the Defendants were the sole Class C members under the Operating Agreement. *Id.* at 276, 287. Fiederlein was classified as a Class F member. The Operating Agreement specified the method for determining the compensation to which all physicians, including the parties, would be entitled from Unity. *Id.* at 276, 287. From October 2003 until August 2005, the Defendants' compensation from Unity was calculated under the Class C member formula contained in the Operating Agreement, and Fiederlein was compensated under the Class F member formula. *Id.* at 277, 288.

Between 2000 and 2003, distributions of income that should have been made to the existing Unity members were instead diverted by Unity to capital expenditures. *Id.* at 277, 288. The members whose income was diverted paid taxes on that income, even though the compensation was withheld from them by Unity. *Id.* at 277, 288. In 2005 after an accounting review, Unity discovered accounting errors with the members' capital accounts. As a result, each member, who had compensation converted to a capital account between 2000 and 2003, had their capital accounts recalculated and received a refund in 2005 from their capital accounts. *Id.* at 277, 288. The Defendants each received a refund totaling approximately $190,000. Fiederlein had only been a member of Unity for a short time when these capital contributions were initially made, and as a result, little or none of his prior compensation had been withheld. *Id.* at 277, 288. Because Fiederlein had made no signifi-

cant extra capital account contribution between 2000 and 2003, he received no significant capital account adjustment or refund. *Id.* at 277, 288.

In August 2005, Unity sold a one-half interest in InnerVision to a hospital. Unity determined that the sale proceeds were to be considered as profits relating to InnerVision. Based on this determination, the profits were to be paid out according to the member compensation formula contained in the Operating Agreement. The Defendants sent a letter to Unity, dated August 30, 2005 ("August 30 letter"), requesting that the profits from the sale be reallocated according to the letter. The letter reallocated the profits as follows: (1) the Defendants were to each receive an initial "Buy-in Gross-up" of $620,348, which represented $500,000 in initial buy-in, grossed up for payment of taxes; (2) Fiederlein was to receive his Class F allocation; (3) and the remaining proceeds of $2,444,805 were to be split equally between the parties with each receiving $814,935. *Id.* at 296–97. The letter also expressly stated that they were still working on the "internal agreements that will result in Class C ownership for ... Fiederlein" and that they wished to "allocate an equal third of Class C profits to ... Fiederlein while that process is taking place." *Id.* at 296. Fiederlein accepted the $814,935 allocation.

The Chief Financial Officer for Unity, Michelle Troyer ("Troyer"), testified that, after the August 30 letter, Fiederlein was treated for all financial purposes as a Class C member. He was paid an allocation of income as a Class C member would from that time forward. *Id.* at 612. Through the end of 2005, Fiederlein received "financially, everything that—that he would have received as a full Class C member." *Id.* No Class C distributions were made to anyone in 2006 until after the first quarter

of that year. For financial purposes, a Fourth Amended Operating Agreement ("Fourth Agreement"), which was adopted later in 2006, was made retroactive to January 1, 2006.

In late 2005 and early 2006, Unity wanted to change the Operating Agreement and adopt the Fourth Agreement. The Defendants believed that the compensation formulas proposed in the Fourth Agreement would result in a significant reduction in the compensation paid to Class C radiologists as such compensation would be diverted to increase the compensation of non-radiologist members of Unity. *Id.* at 278, 289. The Operating Agreement required a majority of the Class C members to agree to any change in their compensation formula. *Id.* at 279, 290.

An involuntary termination of a Class C member triggered a severance payment "based upon a multiple of the prior years' Class C compensation." *Id.* at 279, 290. Due to the sale of part of InnerVision in 2005, and its impact on the compensation of Class C members, the severance payment for a termination of a Class C member in 2006 would have been very high. *Id.* at 279, 290. "In an effort to gain leverage in the negotiations against [the Defendants], Unity threatened to take steps during 2006 to artificially reduce the income generated by ... InnerVision ..., by discouraging referrals from Unity physicians." *Id.* at 280, 291. "Unity suggested that they would direct Radiology Center business to their competitors, to reduce the InnerVision ... profits." *Id.* at 280, 291. In response to this negotiation tactic of Unity, the Defendants sent a letter to Unity on February 15, 2006 ("February 15 letter"), stating:

> Please be advised that as of January 1, 2006, as the only Class C owners, we hereby request all InnerVision profits be allocated equally between ... Jones and

... Boutselis, as per the Operating Agreement of Unity Healthcare. Please disregard our letter to the contrary dated August 30, 2005.

*Id.* at 492. The Defendants did not notify Fiederlein that they were sending this letter; he learned of it from Unity.

Because the Defendants and Fiederlein had different objectives in negotiating with Unity, they conducted separate negotiations, and Fiederlein was represented by counsel. On April 14, 2006, the parties signed a Separation and Mutual Release Agreement ("Separation Agreement") with Unity and another doctor in the practice. Under the Separation Agreement, the Defendants were to each receive a severance payment of $1,050,000 in exchange for their relinquishment of any and all rights that they had in Unity and in Unity's affiliates, including InnerVision. *Id.* at 299–308. Further, under the Separation Agreement, Fiederlein remained with Unity, and once the Fourth Agreement was signed, he was to become a Class C member. *Id.* The Separation Agreement went into effect on April 21, 2006. The April 28, 2006 Unity distribution was calculated under the Fourth Agreement, and Fiederlein received his full distribution as a Class C member retroactive to January 1, 2006. *Id.* at 613.

On February 14, 2008, Fiederlein filed a complaint against the Defendants, alleging seven counts, including breach of contract, promissory estoppel, unjust enrichment, conversion, criminal conversion, interference with employment relationship, and fraud. *Id.* at 52–61. With their answer, the Defendants filed a counterclaim, seeking the return of the $814,935, which they alleged were funds advanced but unearned by Fiederlein. *Id.* at 79–82. On May 8,

2009, the parties filed cross motions for summary judgment, and a hearing was held on these motions on June 25, 2009. On November 18, 2009, the trial court entered an order ("November 18 order") granting the Defendants' motion for summary judgment in part and denying it in part, and denying Fiederlein's motion for summary judgment. The November 18 order resulted in the dismissal with prejudice of Fiederlein's claims of breach of contract, conversion, criminal conversion,[2] interference with employment relationship, fraud and portions of his claims of promissory estoppel and unjust enrichment as they pertained to "the Separation Agreement and/or the purported Ownership payment." *Id.* at 37. However, the trial court found that questions of fact existed as to Fiederlein's claims of promissory estoppel and unjust enrichment as they pertained to the "December 2002 proposal and/or the InnerVision Class C member profits" of Fiederlein's complaint and as to the Defendants' counterclaim for unjust enrichment regarding the payment of $814,935. *Id.*

On July 8, 2010, the Defendants filed a renewed motion for summary judgment on the remaining counts in Fiederlein's complaint, and a hearing was held on this motion on September 1, 2010. On September 15, 2010, the trial court entered its order ("September 15 order") granting the Defendants' motion for summary judgment in part and denying it in part. The trial court found that summary judgment should be denied as to Fiederlein's unjust enrichment claim as it pertained to the Defendants' receipt of the capital accounts refund. *Id.* at 46. The September 15 order also granted the Defendants' summary judgment motion as to Fiederlein's

---

**2.** Fiederlein does not take issue in his appeal with the grant of summary judgment as to his

claims of conversion and criminal conversion.

remaining claims relating to promissory estoppel and unjust enrichment. Therefore, the only claims that were left to be decided after this order were Fiederlein's unjust enrichment claim, regarding the capital accounts refund, and the Defendants' counterclaim. Additionally, the trial court ordered that "there is no reason to delay and that the clerk should enter a final appealable judgment dismissing all counts of [Fiederlein's] complaint except for the unjust enrichment regarding the capital account refund issues." *Id.* at 51. Fiederlein now appeals, and the Defendants cross-appeal.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing a grant or denial of summary judgment, we apply the same standard as the trial court: summary judgment is only appropriate when the designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Jacobs v. Hilliard*, 829 N.E.2d 629, 632 (Ind. Ct.App.2005), *trans. denied.* We construe the pleadings, affidavits, and designated evidence in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind.Ct.App.2008), *trans. denied* (2009). Because a trial court's grant of summary judgment comes to us clothed with a presumption of validity, the appellant must persuade us that error occurred. *Beatty*, 896 N.E.2d at 20. If the trial court's entry of summary judgment can be sustained on any theory or basis in the record, we must affirm. *Irwin Mort. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d 439, 442 (Ind. Ct.App.2004). Even so, we must carefully review a grant of summary judgment in order to ensure that a party was not improperly denied his or her day in court. *Smither v. Asset Acceptance, LLC*, 919 N.E.2d 1153, 1156 (Ind.Ct.App.2010) (citing *Reeder v. Harper*, 788 N.E.2d 1236, 1240 (Ind.2003)).

■ Under federal summary judgment procedure, the party seeking summary judgment is not required to negate an opponent's claim; the movant need only inform the court of the basis of the motion and identify relevant portions of the record " 'which it believes demonstrate the absence of a genuine issue of material fact.' " *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The burden then rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof. *Id.* Indiana does not adhere to *Celotex* and the federal methodology. *Id.* In contrast, under Indiana procedure, the party moving for summary judgment has the burden of establishing that no genuine issue of material fact exists. *Schmidt v. Am. Trailer Court, Inc.*, 721 N.E.2d 1251, 1253 (Ind.Ct. App.1999) (citing *Jarboe*, 644 N.E.2d at 123), *trans. denied* (2000). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind.2009). Only after the moving party has met this burden with a prima facie showing that no genuine issue of material fact exists does the burden then shift to the non-moving party to establish that a genuine issue of material fact does in fact exist. *Id.*

## I. Summary Judgment in Favor of the Defendants

Fiederlein argues that the trial court erred when it granted summary judgment in favor of the Defendants on his claims of breach of contract, promissory estoppel, unjust enrichment, interference with employment relationship, and fraud. He specifically claims that an agreement existed between himself and the Defendants to make him a Class C member in Unity and that the defendants breached such agreement by failing to equally share all Inner-Vision profits over $500,000 and by informing Unity in the February 15 letter that he was not a Class C member. He further alleges that the Defendants' promise to make him a Class C member in Unity induced him to continue his employment with Unity and to forego profits for the benefit of the Defendants and that the Defendants were unjustly enriched by refusing to share the InnerVision profits equally. Fiederlein additionally argues that, when the Defendants informed Unity that he was not a Class C member, they interfered with his employment relationship with Unity and committed fraud when they sent the February 15 letter, which stated he was not a Class C member. He therefore contends that issues of material fact exist as to each of his claims, making it improper for the trial court to grant summary judgment as to the claims.

### A. Breach of Contract

Fiederlein first argues that it was error for the trial court to grant summary judgment as to his breach of contract claim. He claims that a contract existed between him and the Defendants in which he would become a Class C member in Unity and that the Defendants breached the contract when they failed to pay him an equal share of profits and when they informed Unity that he was not a Class C member in the February 15 letter. Fiederlein specifically asserts that, contrary to the trial court's findings, the parties intended to be bound by the offer in the 2002 proposal, that he accepted the offer made by the Defendants in that proposal, and that the facts showed that the parties engaged in conduct that supported the existence of a contract, specifically the August 2005 distribution.

■■■ The existence of a contract is a question of law. *Batchelor v. Batchelor*, 853 N.E.2d 162, 165 (Ind.Ct.App.2006). The basic requirements for a contract include offer, acceptance, consideration, and a meeting of the minds of the contracting parties. *Id.* " 'A mutual assent or a meeting of the minds on all essential elements or terms must exist in order to form a binding contract.' " *DiMizio v. Romo*, 756 N.E.2d 1018, 1022 (Ind.Ct.App.2001) (quoting *Homer v. Burman*, 743 N.E.2d 1144, 1146–47 (Ind.Ct.App.2001)), *trans. denied* (2002). "The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract." *Wallem v. CLS Indus., Inc.*, 725 N.E.2d 880, 883 (Ind.Ct.App.2000) (citing *Olsson v. Moore*, 590 N.E.2d 160, 162 (Ind.Ct.App.1992)).

■■ In the present case, the designated evidence established that there was never a meeting of the minds as to the terms of the purported contract and that Fiederlein knew of the Defendants' lack of intent to be bound by the terms in the 2002 proposal. At his deposition Fiederlein testified as follows:

Q: So this proposed agreement between four persons was rejected by one of the persons who was to be a party to it.

A: That's correct.

Q: And no new document was ever prepared to replace this four-person agreement with a three-person agreement.

A: Just by my entreaties to the contrary.

Q: And your entreaties were met with their express refusal because they told you they weren't ready to execute such a document with you.

A: They always had some reason for why it couldn't be done, usually related to what was going on in the underlying Unity issues.

. . . .

Q: But they were telling you they did not want to execute the document because substantively they did not want to create that relationship for various reasons, not merely a matter of "I'm too busy," "I've lost my pen," or anything procedural like that.

A: They indicated their discomfort with changes going on in Unity; they didn't want to proceed.

*Appellant's App.* at 198. Further evidence showed the Defendants' lack of intent to make Fiederlein a Class C member until they had reached a satisfactory agreement with Unity as to their compensation and other conditions were met. *Id.* at 281, 292. The August 30 letter also contained language that internal agreements were still being worked on to make Fiederlein a Class C member and that the process was ongoing. *Id.* at 296.

The evidence showed that the Defendants did not intend to be bound into a contract to make Fiederlein a Class C member until they had resolved their issues with Unity regarding compensation. The evidence also showed that Fiederlein was aware that the Defendants did not wish to proceed until their issues with Unity were resolved. We therefore conclude that the Defendants did not intend to be bound to make Fiederlein a Class C member and there was never a meeting of the minds as to create a contract between the parties. The trial court did not err when it entered summary judgment as to Fiederlein's claim of breach of contract.

### B. Implied Contract

Fiederlein argues that the trial court erroneously granted summary judgment in favor of the Defendants on his claims of promissory estoppel and unjust enrichment when it found that he could not prove damages. He first contends that the trial court misstated and apparently misunderstood his damage theory under these claims. Fiederlein summarizes his claim of damages arising from the breach of an implied contract as follows: when the Defendants notified Unity that he was not a Class C member, he lost valuable negotiating strength. He asserts that, contrary to the trial court's finding, he is not suggesting that he was entitled to a portion of the severance payments paid to the Defendants; he is merely alleging that those payments to the Defendants were evidence of the negotiating strength of Class C members and the potential monetary value he could have obtained and that the Defendants deprived him of that value through their breach of the implied contract.

In his complaint, Fiederlein included claims for both promissory estoppel and unjust enrichment. Both claims of promissory estoppel and unjust enrichment permit recovery where no express contract or contract in fact exists. *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 220–21 (Ind.2009); *Hinkel v. Sataria Distrib. & Packaging, Inc.,* 920 N.E.2d 766, 771 (Ind.Ct.App.2010). The doctrine of promissory estoppel provides that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of

the promise." Restatement (Second) of Contracts § 90(1); *Hinkel*, 920 N.E.2d at 771. "A claim for unjust enrichment 'is a legal fiction invented by the common law courts in order to permit a recovery ... where the circumstances are such that under the law of natural and immutable justice there should be a recovery....'" *Zoeller*, 904 N.E.2d at 220 (quoting *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991), *cert. denied* (1992)). To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. *Id.* These theories are "'legal fictions invented by the common law courts in order to permit recovery where in fact there is no true contract, but where, to avoid unjust enrichment, the courts permit recovery of the value of the services rendered just as if there had been a true contract.'" *Kelly v. Levandoski*, 825 N.E.2d 850, 860 (Ind.Ct.App.2005), *trans. denied.* No action can lie in quasi contract unless one party is wrongfully enriched at the expense of another. *Savoree v. Indus. Contracting & Erecting, Inc.*, 789 N.E.2d 1013, 1018 (Ind.Ct.App.2003).

■ In the present case, the evidence showed that Fiederlein received the full economic benefit of a Class C member from August 30, 2005 until the new compensation formula took effect under the Fourth Agreement. Fiederlein continued to receive full Class C member distributions under the Fourth Agreement. The Defendants presented evidence in the form of testimony from Troyer, who was the CFO of Unity, that Fiederlein received all of the payments to which a Class C member would be entitled and that such payments were not affected by the February 15 letter. *Appellant's App.* at 612, 615. Evidence was also presented that Fieder-

lein admitted in his deposition that he could not prove that his deal with Unity would have been any different if the February 15 letter was not sent. *Id.* at 243, 245. Fiederlein also testified that the validity of his Class C membership was never disputed by Unity and that he would have made the same agreement with Unity, even if the Defendants had not disputed his Class C status. *Id.* at 247, 249, 251. There was also testimony by Fiederlein that he felt the terms of the Fourth Agreement were "very good." *Id.* at 257. We conclude that the evidence presented showed that the Defendants were not unjustly enriched at the expense of Fiederlein. The trial court properly concluded that there was no evidence to support his contention that his negotiations would have been conducted differently if the February 15 letter was not sent and properly granted summary judgment as to Fiederlein's claim of promissory estoppel and unjust enrichment.

## C. Interference with Employment Relationship

Fiederlein contends that the trial court erred when it granted summary judgment as to his claim of interference with employment relationship. He specifically argues that the trial court mistakenly held that the Defendants were acting as agents for Unity when they denied him Class C membership status because they were instead acting in their own interests. In his complaint, Fiederlein claimed that the Defendants had made him an offer to become a Class C member in Unity, which he had accepted, but that they had later informed Unity that he was not a Class C member, which interfered with his employment relationship with Unity and denied him a share of the InnerVision ownership payments. *Appellant's App.* at 59–60.

 Indiana recognizes the general rule that where an agent discloses the identity of his principal and does not exceed his authority when contracting on the principal's behalf, the agent is not personally bound by the contract unless the agent agrees to be so bound. *Kelly*, 825 N.E.2d at 858. Where an agent acted within the scope of the agent's authority in signing a contract on behalf of the principal, the remedy of one seeking to enforce the contract is against the principal and not the agent. *Ind. Dep't of Transp. v. McEnery*, 737 N.E.2d 799, 802 (Ind.Ct.App.2000), *trans. dismissed* (2001).

In *Kiyose v. Trustees of Indiana University*, 166 Ind.App. 34, 333 N.E.2d 886 (1975), the plaintiff alleged that he was promised a promotion to the position of tenured assistant professor upon obtaining his doctorate degree. 166 Ind.App. at 37, 333 N.E.2d at 888. After earning his doctorate degree, he was appointed to assistant professor, but was later notified that he would not be reappointed to that position for the next academic year. 166 Ind. App. at 38, 333 N.E.2d at 888. The plaintiff brought a suit against the trustees of the university, alleging breach of an oral contract and interference with prospective advantage, and the trial court granted the defendants' motion to dismiss for failure to state a claim. 166 Ind.App. at 36, 333 N.E.2d at 887. On appeal, the plaintiff argued that the trustees had been acting in their representative capacity for the university when they made statements creating an expectancy that he would receive tenure, but that they had acted in their individual capacity when they notified him he would not be reappointed. 166 Ind. App. at 44, 333 N.E.2d at 891. In affirming the trial court, a panel of this court noted, "the non-reappointment of faculty members lay within the scope of defendants' official duties ... [, and] liability does not accrue for the performance of acts lying within the scope of the agent's duties." *Id.* Therefore, as the plaintiff's amended complaint only alleged "the commission of acts lying within the scope of defendants' duties ... it failed to allege tortious conduct." *Id.*

 In the present case, under the Operating Agreement, the Defendants were given the right to make any other member a Class C member of Unity, and Unity was bound to grant such classification to any member recommended by the Defendants. The Defendants were therefore authorized to reclassify other members of Unity as Class C members, and as such, they acted as agents of Unity in making any such classifications. Therefore, like the trustees in *Kiyose*, the Defendants were not individually liable for exercising their authority to grant or deny promotions to Class C membership status, which was within the scope of their authority as agents of Unity. It does not matter that Fiederlein argues that the Defendants were acting in their own interest when they sent the February 15 letter because, as we have previously determined, there was no contract between the Defendants and Fiederlein to make him a Class C member in Unity because the Defendants did not intend to be bound to make Fiederlein a Class C member and there was never a meeting of the minds as to create a contract between the parties. Further, as previously stated, the evidence showed that Fiederlein could not prove that he suffered damages as a result of the February 15 letter as he could not prove that his deal with Unity would have been any different if the February 15 letter was not sent and he also testified that the validity of his Class C membership was never disputed by Unity and that he would have made the same agreement with Unity, even if the Defendants had not disputed his Class C status. The trial court did not

err when it granted summary judgment to the Defendants on Fiederlein's interference with employment relationship claim.

### D. Fraud

Fiederlein argues that the trial court erred when it granted summary judgment as to his claim of fraud because he showed "at least an issue of material fact as to whether [the elements were] met." *Appellant's Br.* at 26. He first contends that the parties owed each other a fiduciary duty because they were partners and co-members of an LLC. He next asserts that part of the fiduciary duty owed to a partner is to deal openly and honestly with other partners, and therefore, the Defendants owed him such a duty. He claims that they violated that duty when they failed to tell him about the February 15 letter, revoking his Class C status; Fiederlein alleges this represented an affirmative false representation of fact to Unity and a fraudulent omission in failing to inform him of their actions. He contends his damage as a result of this violation of fiduciary duty was his loss of negotiating strength with Unity. Fiederlein lastly claims that the Defendants gained an advantage at his expense because they admitted that their purpose in sending the February 15 letter was to gain a competitive advantage in their own negotiations with Unity by eliminating the need to share profits with Fiederlein.

■■■■■ The elements of constructive fraud are: (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Am. Heritage Banco, Inc. v. Cranston,* 928 N.E.2d 239, 246 (Ind. Ct.App.2010). Common law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana LLCs. *See Purcell v. S. Hills Invs., LLC,* 847 N.E.2d 991, 997 (Ind.Ct.App.2006) (holding that common law fiduciary duties are applicable to Indiana LLCs).

■■■■■ Here, although the Defendants may have owed Fiederlein a duty to deal fairly and honestly with him, the evidence showed that they made no misrepresentations of past or existing facts, regarding making him a Class C member, as alleged in Fiederlein's complaint. The Defendants informed Fiederlein that they did not intend to make him a Class C member until they had reached a satisfactory agreement with Unity as to their compensation and the other conditions were met. *Appellant's App.* at 281, 292. The August 30 letter also contained language that internal agreements were still being worked on to make Fiederlein a Class C member and that the process was ongoing. *Id.* at 296. Additionally, as to the February 15 letter, the evidence showed that Fiederlein did not suffer any damage as a result of the letter because Fiederlein admitted in his deposition that he could not prove that his deal with Unity would have been any different if the February 15 letter was not sent. *Id.* at 243, 245. Fiederlein also testified that the validity of his Class C membership was never disputed by Unity and that he would have made the same agreement with Unity, even if the Defendants had not disputed his Class C status. *Id.* at 247, 249, 251. We therefore conclude that the trial court did not err when it granted summary judgment as to Fiederlein's fraud claim.

## II. Counterclaim

Fiederlein argues that the trial court erred when it denied his motion for summary judgment as to the Defendants' counterclaim. He initially contends that, in the September 15 order, the trial court found that he had been given Class C membership status on August 30, 2005, and this finding is fatal to the Defendants' counterclaim. Secondly, Fiederlein claims that Jones's contention to the trial court that the payment was "an act of generosity," *Appellant's App.* at 371, was illogical and that the payment was actually his Class C member allocation after the required buy-in. Further, Fiederlein asserts that he accepted the payment based on the belief that it was his Class C distribution, and the Defendants never made a demand for repayment of the money. He also points out that, by the time the instant lawsuit was filed, his Class C status had been confirmed at least by January 1, 2006 under the Separation Agreement. Fiederlein therefore claims that the Defendants cannot sustain a claim of unjust enrichment, and summary judgment was improperly denied.

In their answer, the Defendants alleged a counterclaim arguing unjust enrichment because the $814,935 distribution was received by Fiederlein in anticipation of Fiederlein becoming a Class C member, and because the necessary agreements and conditions for him to become such were never achieved, the sum was unearned, and Fiederlein was obligated to repay the amount to the Defendants. Fiederlein filed a motion for summary judgment as to this counterclaim, which the trial court denied, finding that questions of fact existed as to whether the parties had an implied contract. *Id.* at 37. As previously stated, "[a] claim for unjust enrichment 'is a legal fiction invented by the common law courts in order to permit a recovery ...

where the circumstances are such that under the law of natural and immutable justice there should be a recovery....'" *Zoeller,* 904 N.E.2d at 220 (quoting *Bayh,* 573 N.E.2d at 408). To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. *Id.*

■ Here, the designated evidence failed to show that there was an agreement between the parties regarding any conditions attached to the payment of the $814,935 distribution. No evidence was produced to show that the payment to Fiederlein was conditioned on his doing anything or contingent upon any performance on his behalf. The August 30 letter, which notified of the distribution, made no mention of any conditions attached to the payment of the money; particularly no conditions concerning the repayment of such sum was included. *Appellant's App.* at 296–97. Therefore, the trial court erred when it denied Fiederlein's motion for summary judgment as to the Defendants' counterclaim for the repayment of the $814,935 distribution due to unjust enrichment, and we reverse such denial.

## III. Cross–Appeal

When the trial court issued the September 15 order regarding the parties' motions for summary judgment, it specifically found that summary judgment was denied as to Fiederlein's claim of unjust enrichment regarding the capital account refunds. *Appellant's App.* at 50. The Defendants argue that the trial court erred when it failed to grant summary judgment in their favor on all of Fiederlein's claims and theories. They assert that the written proposal presented to Fiederlein and Lach specified that the doctors would not re-

ceive a twenty-five percent share of Unity Class C member distributions until after the Defendants received $500,000 each in future distributions, which was intended to compensate the Defendants for their risks and efforts in founding InnerVision. *Id.* at 63. The Defendants contend that the calculation of the $500,000 threshold was expressly limited to profits generated by InnerVision beginning in 2004 and that the capital account refunds were earnings from prior to 2004. Because the capital accounts refund was for profits that occurred between 2000 and 2003, they claim that these profits were explicitly excluded from the calculation of the $500,000 threshold and any profit distribution to which Fiederlein may have been entitled.

■ The designated evidence showed that between 2000 and 2003, Unity earned profits that were allocated to members but not distributed, and the Defendants were required to pay taxes on these "paper profits." *Id.* at 277, 288. The earnings were identified as additional capital contributions and credited to the capital accounts of the doctors whose earnings were used for that purpose, which did not include Fiederlein since he was not an employee of Unity at the time the capital expenditures occurred. *Id.* at 277, 288. These earnings were expressly and unambiguously excluded in paragraph five of the proposal in the following language: "However, they will forgo InnerVision profits for a period of time such that founding partners each receive $500K in InnerVision profits (cash profits paid out, starting in 2004, does not include 'paper profits' of 2003)." *Id.* at 63. Therefore, the designated evidence showed that the capital accounts refund should not have been part of the $500,000 threshold, and the distribution of such "paper profits" was properly excluded from the $500,000 threshold of post–2004 earnings described in the pro-

posal. We conclude that the trial court erred when it denied the Defendants' motion for summary judgment as to Fiederlein's claim of unjust enrichment regarding the capital account refunds, and we reverse such denial.

Affirmed in part and reversed in part.

MATHIAS, J., and BAILEY, J., concur.